98   579
100   361
100   373
98   579
101   70

FRED T. ULMER AND MARY F. ULMER, In Equity,

*vs.*

LIME ROCK RAILROAD COMPANY.

Knox.    Opinion April 25, 1904.

*Railroads.*  Branch Track.  *Eminent Domain.  Public Use,* Tests of.  Legislative Determination.  *Intercorporate Relations,* Control of Corporate Property. *Right of way.  New Construction,* Cost and income of.  *Directors—* Good faith.  *Procedure.  R. S. 1903, c. 51, § 30. Special Laws, 1889, c. 418.*

The mere fact that a railroad company builds a branch track for the immediate purpose of accommodating a private business enterprise, is by no means a controlling test to determine whether the right of way therefor is taken for private purposes, or for public use, by right of eminent domain.

While the power of eminent domain should not be so extended as to allow the taking of private property of one for the private benefit of another, it should not be so abridged as to interfere with the development of enterprises of a public nature, within the meaning of the Constitution.

By the great weight of authority, the decisive tests as to whether a branch railroad track is for public or private purposes, are these:  Is the track to be open to the public, on equal terms to all having occasion at any time to use it, so that all can demand that they be served without discrimination, as of right?  If so, and the track is subject to governmental control, under general laws, as are the main lines of a railroad, then the use is public, and the case a proper one for the exercise of the right of eminent domain.

In *Farnsworth* v. *Lime Rock Railroad Company,* 83 Maine, 440, the purpose of this particular railroad, so far as its main line is concerned, viz., the transportation of lime stone and other freight to and from the lime kilns and stores along its line, was declared to be a public use.  In order to perform business of this nature, it is absolutely essential that connections should be made with the different lime kilns, in many instances by branch tracks.

While legislative determination that the use for which property authorized to be taken by eminent domain is a public one, is, undoubtedly, subject to review by the courts, yet it is a familiar principle that all reasonable presumptions are in favor of the correctness of the legislative decision; and the act must be regarded as valid, unless it can be clearly shown to be in conflict with the Constitution.

The exercise of the power of eminent domain for the purpose of acquiring a right of way for a branch track, is, in effect, a declaration by the railroad

company that such track is to be open to the public and operated as a public way and subject to all public rights and public control.

If the purpose of a railroad corporation in building any particular branch track, is to operate the same in conformity with the foregoing requirements, the power of eminent domain granted by the legislature, may properly be exercised, even though few may have occasion to be served by the branch, outside the owners of the quarry to which it is to be constructed.

A business or manufacturing corporation, by owning nearly all the stock of a railroad corporation, does not thereby become the owner of the railroad company's road, franchises, or other property. A railroad company, whoever may be the owner of its stock, still owns its property.

Control of the property of a corporation is not in its stockholders. Of course, a majority of stockholders control the election of its officers and agents. But the control of the company's property is in the corporation itself, and in its officers and agents, who are intrusted with such control by virtue of the by-laws.

Railroad franchises must be exercised by the corporation to which they are granted, and by it alone.

A corporation is an entity, irrespective of the persons who own all of its stock; and the fact that one person owns all the stock does not make such owner and the corporation one and the same person. Neither is there any identity between the individual or the corporation which owns such stock in another corporation, and the latter corporation.

If a railroad corporation unreasonably fails to perform the public duty for which it was chartered, and the management makes discrimination clearly showing an intention to exclude from the benefits of the road all except its principal stockholder, for the purpose of preventing competition, it might be sufficient to work a forfeiture of the railroad company's franchises.

It cannot be the duty, however, of a railroad company to build a branch track to connect with some particular lime quarry simply because such connection may be desired by the owner, independently of the question of the cost of construction and the probable income to be derived.

It is the duty of the management of a railroad company, before entering into new construction to take into consideration both the probable cost of the same and the amount of freight which would be obtained therefrom for transportation.

So long as the directors of a railroad corporation act in good faith upon such questions, their determination is conclusive and is not subject to review by proceedings in court.

The question whether or not a railroad corporation has done, or failed to do, anything which should result in a forfeiture of its franchises can only be inquired into by a proceeding appropriate for that purpose, such as an information in the nature of quo warranto, instituted by the proper authorities in behalf of the State.

On report.   Bill in equity.   Dismissed.

Bill in equity asking that respondent railroad corporation be enjoined from constructing a branch track across plaintiff's premises, and for general relief.

The facts appear in the opinion.

*D. N. Mortland and J. E. Moore,* for plaintiffs.

Pursuing the policy adopted throughout the country to develop resources and encourage enterprise, our legislature in passing the Mill Act then "push the power of eminent domain to the very verge of constitutional inhibition." *Jordan* v. *Woodward,* 40 Maine, 317, 323.

Plaintiffs contend that in sustaining railroad legislation too, the court went "to the very verge of constitutional inhibition" in respect to the main line of this very enterprise. *Farnsworth* v. *Lime Rock R. R.,* 83 Maine, 440.

Yet the decision in that case was not in respect to a spur track to one quarry merely, as here; but was in relation to the general enterprise itself, to taking a right of way for the main line. The court said "though not so significant an example as many railroad enterprises, it falls on the side of public use. It is of that stamp."

The plaintiff contends that the stamp is now obliterated. The reasons then given for holding this defendant corporation to be a public enterprise do not now exist. At the time of the decision the interests of the community were to be subserved. Today, under the present ownership and control, as the evidence shows, the design is directly to the contrary. All the reasons then given by the court for holding this corporation to be a public enterprise, related to the enterprise itself. Today this railroad is designed to reach the quarries and kilns of its chief stockholder, the Rockland-Rockport Lime Co., and none other if the latter company can prevent it.

In the case at bar a private business corporation has by purchase acquired the stock and control of a railroad corporation, chartered ostensibly for a public purpose, and having the power of eminent domain. It now asks to exercise and enjoy the privileges granted to the railroad corporation which it has absorbed, for its own advantage and gain.

The Ohio court in a case similar to the one at bar, held that "a railroad used exclusively for transportation of coal or freight for its stockholders, and which had no depots, freighthouses or facilities for doing a public business, is a private enterprise." *State* v. *Ry. Co.*, 40 Ohio, 504; Vol. 2 Wood on Railroads, p. 835; *In re Niagara Falls & W. R. Co.*, 108 N. Y. 375.

In a West Virginia case where a railroad corporation sought to condemn land to build a switch and a branch track to reach a private manufactory, a steel mill, for the purpose of transporting freight to and from said steel mill, it was held that the use to which the land was to be subjected, was a private, not a public use. *Pittsburg, Wheeling & Kentucky Railroad Co.* v. *Benwood Iron Works*, 31 W. Va. 710, 2 L. R. A. 680.

Counsel contended that one body corporate having the right of eminent domain cannot sell or lease to another their corporate powers and privileges and thereby disable themselves from performing their public duty without legislative authority. *Brunswick Gas Light Co.* v. *United Gas, Fuel and Light Co.*, 85 Maine, 532, 35 Am. St. Rep. 385; R. S. 1903, c. 52, § 30.

Counsel contended that such abuses of corporate rights and privileges under the conditions of control shown by the case, takes from this railroad corporation its former character of being a public enterprise, and subverts it franchises to private use for purposes of private gain.

The question presented in the case at bar is whether trade combinations created for private purposes shall be permitted to buy up and absorb public franchises and avail themselves of the powers and privileges of eminent domain to further their own private interests.

*C. E. and A. S. Littlefield,* for defendants.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, POWERS, PEABODY, SPEAR, JJ.

WISWELL, C. J.    The defendant, the Lime Rock Railroad Company, is a corporation organized under chapter 418 of the Private and Special Laws of 1889, and the amendments thereto, and was

given power by its charter, "to construct, maintain and use one or more lines of railroad to be operated by steam or horse power, with single or double tracks, from the lime quarries in the city of Rockland and town of Thomaston, in such direction as may best convene the transportation of lime stone from said quarries to the various lime kilns in said city and town, together with other freight, with convenient branches to accommodate each kiln." It was also authorized, "to construct, maintain, use and operate all side tracks, spurs, turnouts and branches, and to make such additions to its present location, from time to time, as may be necessary or convenient in order to reach the various lime quarries and lime kilns that are now opened or built, or that may be hereafter opened or built, in said city and town." The corporation was also given power to purchase and hold such real estate as might be necessary and convenient for its purposes; "and in case said corporation cannot agree with the owners of land necessary and convenient for said road, it may be taken for the aforesaid purposes, as and for public uses, subject to the same damages and proceedings as when land is taken by other railroads under the general laws of the state."

The corporation soon after the date of its charter filed locations for the lines of its roads in accordance with the provisions of its charter, and has since, from time to time, made additional locations, in each case stating therein that such location was a partial location and that it reserved the right thereafter to make additional locations. The road has been built and has been in operation for a number of years, and now consists of about thirteen miles of track extending from various lime quarries in Rockland and Thomaston to the lime kilns; it also connects with the Maine Central Railroad at Rockland and with an electric street car line extending through the two towns. The principal business of the road has always been the transportation of lime rock from the quarries to the kiln, but it has also been engaged to a considerable extent in the transportation of other freight between the Maine Central Railroad station and the places of business of various persons, firms and corporations.

On January 20, 1903, the railroad company commenced proceedings to condemn, under its power of eminent domain, a right of way

over the land of the complainants, for the purpose of building thereon a branch track from one of its main lines to a lime quarry owned by the Rockland-Rockport Lime Company.   No question is raised as to the form or sufficiency of the proceedings commenced by the railroad company for the purpose of acquiring by condemnation this easement; but in this bill the complainants ask that the railroad company may be restrained from further proceedings and from taking possession of any portion of the complainant's premises for this purpose.   The prayer for this relief is based upon many reasons set out in the bill which will be considered; the principal ground for relief is that the easement in the complainants' real estate is not to be taken by the railroad company for a public use, but solely for the private use and benefit of the railroad company and of the owner of the quarry to which a branch track is to be constructed.

The charter of the company, already quoted from, authorized the railroad company, so far as it could do so within constitutional limitations, to construct and maintain branch lines to each kiln and to the various quarries then opened, or built, or that might be subsequently opened or built.   Somewhat similar to this authority given to the defendant by its charter is the power conferred upon railroads by a general statute of this state, R. S. (1903), c. 51, § 30, which is as follows:   "Any railroad corporation, under the direction of the railroad commissioners, may locate, construct and maintain branch railroad tracks to any mills, mines, quarries, gravel-pits or manufacturing establishments erected in any town or township, through which the main line of said railroad is constructed," etc. . .

But it is urged that this general statute, and that the provisions referred to in the charter of this railroad company, are unconstitutional, since it allows the private property of an individual to be taken, not for a public use, but for the private purposes of the railroad corporation and of the manufacturer or mine owner who is primarily accommodated by the construction of such branch track; or, that at least in this particular case, the land sought to be taken by the railroad company for the purpose of constructing a branch track from its main line across the plaintiff's land to the lime quarry is for

the sole use and benefit of the railroad company and the lime company, and will in no sense serve any public purpose or use.

The question thus presented, as has been frequently decided in this and many other states of this country, is a judicial one. The legislature has the power to take, or to delegate to another the power to take, private property for public purposes, provision being made for the payment of just compensation therefor, but it cannot take, or delegate to another the right to take, private property for anything but a public purpose. Whenever, therefore, it is contended that this power of eminent domain is attempted to be improperly exercised under legislative authority, it is necessary for the court to determine whether or not the legislature in granting such authority has acted within the limitations of the Constitution, and whether or not in the exercise of this power the corporation is in fact carrying out the public purpose on account of which the power was granted. It is, of course, important in the determination of such a question that this essential attribute of sovereignty should not, upon the one hand, be so abridged as to interfere with the development of enterprises which are of a public nature, within the meaning of the Constitution, or, upon the other hand, so extended as to allow the taking of the private property of one for the private use and benefit of another.

That the ordinary purposes for which railroads are constructed and operated, the transportation of freight or passengers, are essentially public in their nature and of great public convenience and utility is, of course, conceded. "They are public highways; great thoroughfares of public travel and convenience." *In re Railroad Commissioners*, 83 Maine, 273. These great thoroughfares of public travel could not be constructed if the acquisition of their necessary rights of way depended upon the whim, caprice or unreasonable demands of the owners of all lands over which it is necessary for them to be constructed. For this reason public railroad corporations are very properly endowed by the legislature of all states with the power to exercise the right of eminent domain. It is plain that such transportation lines from place to place, whether in the same or in different towns, are as much a public enterprise and use as are public roads con-

structed for the same purpose. That the purposes of this particular railroad, so far at least as its main lines are concerned, are public and therefore that the corporation was properly invested with the right of eminent domain, was decided by this court in 1891. *Farnsworth* v. *Lime Rock Railroad Company,* 83 Maine, 440.

The general question is, then presented, whether or not a railroad corporation, organized under legislative authority for the purpose of constructing and operating a public railroad, with express authority to build a branch track to a private manufacturing establishment, mine or quarry, and invested with the right to take by eminent domain lands necessary for such purposes, may take the private property of an individual, under such right for the purpose of the construction of such a branch track, even if the primary purpose for such taking and construction is to accommodate such manufactory, mine or quarry, and of obtaining the business of the transportation of freight therefrom. There is no arbitrary rule by which this question can be determined in all cases. It must be decided by the application of general principles to the particular facts of each case. Of course the general question is, whether such track is to be constructed for private purposes or for public use. If the branch track is to be built solely and exclusively for the benefit and accommodation of the railroad company and of the owner of the private business enterprise, it may well be said that it would serve no public purpose and would be of no public use, although the existence of such a track might be of great but indirect benefit to the community by enabling the private enterprise to be carried on, and in thereby giving employment to labor. But the mere fact that the primary purpose of such a branch is to accommodate a particular private business enterprise is by no means a controlling test. The character of the use, whether public or private, is determined by the extent of the right by the public to its use, and not by the extent to which that right is or may be exercised. If it is a public way in fact it is not material that but few persons will enjoy it. When such a branch track is first constructed, and the right of way necessary therefor is taken, it may in fact be used only for the business of the plant to which it is constructed, because at that time no other busi-

ness enterprise may exist in that vicinity to furnish freight for transportation, but in the future other enterprises may spring up, either upon the line or upon the extension thereof, so that a branch track which in the first instance is primarily constructed for the accommodation of one, may become of equal accommodation, benefit and use to others. As illustrative of this, the directors of the railroad company have said in their location filed in this particular case: "This location is a location also in part. The line and locations of said railroad are to be extended and additional locations made as soon as the proper course and location of such extensions and additional locations are determined upon, so that said railroad, when the locations thereof are completed, shall reach all of the kilns, quarries and other property that can be accommodated by its southern, northern and other branches."

The tests decisive of this question, as to whether a branch track of this character is to be constructed and operated for public or private purposes, deducible from the great weight of authority upon the question in this country, are these: If the track is to be open to the public, to be used upon equal terms by all who may at any time have occasion to use it, so that all persons who have occasion to do so can demand that they be served without discrimination, not merely by permission but as of right, and if the track is subject to governmental control, under general laws, as are the main lines of a railroad, then the use is a public one and the legislature may grant the power to exercise the right of eminent domain to a corporation which is to construct and operate such track; and if the purpose of the railroad corporation in building any particular branch track is to operate the same in conformity with these requirements, then the power granted by the legislature may be exercised in that particular case.

This is in accordance with the almost unbroken line of decisions of the appellate courts of the various states of this country, brief quotations from a few of which may be advantageous. In *De Camp* v. *Hibernia R. R. Co.*, 47 N. J. L. 43, the court said: "This enterprise does not lose the character of a public use because of the fact that the projected railroad is not a thoroughfare, and that its use

may be limited by circumstances to a comparatively small part of the public. Every one of the public having occasion to send material, implements or machinery for mining purposes into, or obtain ores from the several mining tracks adjacent to the location of this road, may use the railroad for that purpose and of right may require the company to serve him in that respect; and that is the test which determines whether the use is public." To the same effect see *National Dock R. R. Co.* v. *Central R. R. Co.*, 32 N. J. Eq. 755.

In *Kettle River R. R. Co.* v. *Eastern Railway Co.*, 43 Minn. 461, the New Jersey case first above cited is quoted from with approval, the court saying: "If all the people have the right to use the road, it is a public use or interest, although the number who have business requiring its use may be very small." In *Chicago B. & Q. R. R. Co.* v. *Parker*, 43 Minn. 527, the court decided that a spur track extending from the main line of a public railroad across private property to a private manufacturing establishment was a public enterprise, the court saying:—"The switch track is to be a part of its system of tracks, all belonging to the general enterprise of maintaining and operating a railroad for public use." The court in this case also adopted the test applied in numerous other cases, to the effect that the character of the use does not depend upon the amount of business or number of persons who may have occasion to use, but upon the right of the public to use, and goes on to say that there is nothing in the evidence showing that the manufacturer is to have any control over or management of the road, or any right in it other than that of any person or corporation having business establishments along its line.

In *Phillips* v. *Watson*, 62 Iowa, 28, the court said: "The character of a way, whether it is public or private, is determined by the extent of the right to use it, and not by the extent to which the right is exercised. If all the people have the right to use it, it is a public way although the number who have any occasion to exercise the right is very small." The earlier Iowa case of *Bankhead* v. *Brown*, 25 Iowa, 540, is cited by the court in support of this doctrine. In the case last quoted from the spur track from the railroad to the private property was constructed by the owner of the private business

enterprise under a statute authorizing such construction and the condemnation of property therefor. But the right to take private property, even under such circumstances, was sustained, the court saying: "We conclude, therefore, that a road or way established under the provisions of this statute is a public way, in the sense that the public may use and enjoy it in the way in which roads and highways are ordinarily used by it, and that the mine owner who procured it to be established must use the special privilege which the act confers on him in such manner as not to destroy this right of the public or prevent its enjoyment."

The public character of the use of such a branch track, built under similar circumstances, was sustained in the case of *Chicago Dock & Canal Co.* v. *Garrity*, 115 Ill. 155, in which the court said: "We have not regarded the circumstances that they were laid with private funds, and that they terminated opposite or within convenient contiguity of a private manufacturing establishment, as materially affecting them and giving a private character to their use. All termini of tracks and switches are more or less beneficial to private parties, but the public character of the use of the tracks is never affected by this. If they are open to the public use indiscriminately, and under the public control to the extent that railroad tracks generally are, they are tracks for public use. It may be in such cases that it is expected or even that it is intended, that such tracks will be used almost entirely by the manufacturing establishment; yet, if there is no exclusion of an equal right of use by others, and this singleness of use is simply the result of location and convenience of access, it can not affect the question." Numerous other Illinois cases are cited in that opinion.

In a recent Illinois case, announced October 26, 1903, *Gaylord* v. *Sanitary District of Chicago*, 204 Ill. 576, 68 N. E. R. 522, the general doctrine is thus stated: "It is also the settled doctrine of this court that, to constitute a public use, something more than a mere benefit to the public must flow from the contemplated improvement. The public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right." To the same effect is the case of *Butte, etc., Railway Co.* v.

*Montana, etc., Railway Co.,* 16 Montana, 504, 50 Am. St. R. 508, in which many of the cases already referred to, as well as others, are cited and the constitutionality of legislative authority, and the public character of the use for which the land was to be taken, under circumstances similar to those in the case at bar, are upheld.

In a recent case in Wisconsin, decided in November, 1901, *Chicago and North Western Railway Company* v. *Morehouse,* 112 Wis. 1, 88 Am. St. Rep. 918, in which this particular question was involved, it was decided that: "A statute authorizing railroad companies to condemn land for branches and spur tracks to any 'mill, elevator, store-house, or other industry or enterprise,' is valid and constitutional, and the taking of land for a spur track to connect with a single industry, is a taking for public use, if the purpose of the company is to maintain and operate such track as an integral part of its railway system, so as to serve all who may desire it, and all can demand, as a right, to be served without discrimination." Many cases are cited by the court in support of this doctrine, some of which have already been referred to.

To the same effect, either upon the particlar question here involved or upon the general question as to when an enterprise is of such a public character as to authorize the grant of the right of eminent domain, and the exercise of such right for its necessary purposes, are the following cases: *St. Louis, etc., R. R. Co.* v. *Petty,* 57 Ark. 359, 20 L. R. A. 434; *Bridal Veil Lumbering Co.* v. *Johnson,* 30 Ore. 205, 60 Am. St. Rep. 818; *Toledo, &c., R. R. Co.* v. *East Saginaw, etc., R. R. Co.,* 72 Mich. 206; *Dietrich* v. *Murdock,* 42 Mo. 279; *Hays* v. *Richer,* 32 Penn. St. 169; *Talbot* v. *Hudson,* 16 Gray, 417; *Denham* v. *County Commissioners,* 108 Mass. 202.

In opposition to these authorities, and numerous others to the same effect that might be cited, we are aware of but two cases directly in point wherein different views have been expressed. These cases are, *Pittsburg, etc., Railroad Co.* v. *Benwood Iron Works,* 31 W. V. 710, 2 L. R. A. 680 and *Kyle* v. *Texas & New Orleans Railroad Co.,* 4 L. R. A. 275, not officially reported. As to these cases we only need to say that the reasoning of the opinions is not satisfactory to us. They both proceed upon the theory that because the primary and

immediate purpose of building the branch tracks in question was to accommodate the railroad and the private business enterprise, to which they were extended, they were necessarily for a private purpose and could not under any circumstances be for a public use. This is not in conformity with the weight of authority.

Adopting these general principles and the tests determinative of the question involved, which have been almost universally laid down by the courts of this country, we come to the question as to whether in this particular case an easement in the plaintiff's land may be taken by the defendant corporation, for the purpose of building this branch track, as for public uses. And this question may perhaps be resolved into two, first, as to whether the legislative authority was constitutional; and, second, if it should be held to be, whether or not in attempting to exercise that right, in this particular instance, the railroad company is in fact carrying out one of the public purposes for which it was chartered.

It, of course, must be conceded that the legislature, in so far as it could do so, delegated this power to the railroad company in the most express and explicit terms. And in determining the question of the constitutionality of this legislation it must be remembered, that, although the court must finally determine the constitutionality of any legislation, all reasonable presumptions are in favor of its validity, and the courts will not declare an act of the legislature to be invalid, because contrary to the provisions of the organic law, unless it is clearly so. This is a familiar principle recently stated by this court in State v. Rogers, 95 Maine, 94. And this is as true respecting legislative enactments by which the power to exercise the right of eminent domain is delegated as in regard to any other species of legislation. The determination by the legislature that the use for which property is authorized to be taken is a public one, is, undoubtedly, subject to review by the court, but all reasonable presumptions are in favor of the validity of such determination by the legislation, and the act must be regarded as valid unless it can be clearly shown to be in conflict with the Constitution. Hazen v. Essex County, 12 Cush. 477; Talbot v. Hudson, 16 Gray, 422; Moore v. Sanford,

151 Mass. 285; *United States* v. *Gettysburg Electric Railway Co.* 160 U. S. 668.

That the legislature in granting these powers and privileges to the defendant did not transcend its constitutional limitations, must, we think, be obvious.   The power was granted to a public railroad corporation, the principal purpose of which was the transportation of lime stone and other freight for all persons whom it could accommodate.   This, as we have seen, is universally conceded to be a public purpose.   The nature of the business of the corporation was to be such that it was absolutely essential, in order to perform that business that connection should be made with the different quarries and lime kilns, in many instances by a branch track.   In fact the constitutionality of this legislation was sustained by this court in *Farnsworth* v. *Lime Rock Railroad Co.*, 83 Maine, 440, a decision which there is certainly no reason to question.

But, it is argued that even if the original legislation was constitutional, the authority granted being somewhat general in its character, and no reference being made, necessarily, to this particular quarry or branch track, that the exercise of this right by the railroad company is not within the terms of the charter, because the purpose of the management of the railroad company, in taking this land and in building this branch track, was not to serve a public purpose, but to accomplish its own private ends for its own benefit.

It is undoubtedly true that for the present, at least, few persons may have occasion to be served by this branch track, except the owner of the quarry to which it is to be constructed, and we assume that it is equally true that the primary purpose in the construction of this track is to obtain the transportation of freight from this quarry to and over the main lines of the railroad company's road.   But, as we have already seen this is by no means decisive of the character of the use of the road, or branch track; and there is nothing further to indicate that it is to be for the sole and exclusive benefit of the quarry owner, or that all members of the public will not be entitled to demand of right, whenever they may have occasion to do so, that their freight of all kinds shall be transported to the quarry over this branch road; or that the owners of other quarries that may be

opened either upon the branch track or any extension thereof, shall not have the right to demand that the product of their quarries shall be transported without discrimination over the same. In fact this track must be operated by the railroad company for the benefit of all persons that may have occasion to use it; it must be operated by the railroad company as an integral part of its entire system, and as much subject to public control as any other part of the road, because the directors of the railroad company in acquiring this right of way for the track have exercised the right of eminent domain, and have thereby in effect declared that it is to be open to the public and operated as a public way subject to all public rights and public control. . This action of the directors has some tendency to show their purpose. If it were not their intention that the branch should be open to the public and operated for the benefit of all members of the public who may have occasion to use it, they would not have attempted to acquire the right of way in this manner.

Again, the directors of the road in the location filed by them have said that this was a partial location only, to be extended and additional locations made as soon as the proper courses and locations for such extensions are determined upon, so that this branch track when completed "shall reach all of the kilns, quarries and other property that can be accommodated by its southern, northern and other branches." We are aware of no reason why the truth of this statement should be disputed. For these reasons we are of the opinion that the legislative grant of the right of eminent domain to the railroad company was constitutional, because it authorized the taking of private property for public purposes, and that in the exercise of that right in this particular case the railroad company was carrying out one of the public purposes for which it was chartered, and to accomplish which this power was granted to it.

Another cause of complaint, much relied upon in argument, and which appears in different forms of allegation throughout the bill is, that all of the stock of the railroad company is at the present time owned by the Rockland-Rockport Lime Company. It appears from the evidence that each of the directors of the railroad company is the owner of one share of its capital stock and that all of the rest of the

stock is owned by the Lime Company. It is argued from this that the Lime Company, a corporation organized purely for private purposes, with no duties to perform of a public nature, is in fact the owner of and is in possession and control of the railroad and of all the franchises and privileges that were granted by the legislature to the railroad company, and that as such owner it is operating and managing the same for the sole benefit of the Lime Company, to the exclusion of all others.

But the argument is based upon a wrong assumption. Whoever may be the owner of the stock of the railroad company, or however many or few such owners there may be, that corporation still continues to exist as a separate and independent corporation; it preserves its corporate existence, it operates its own road, it has its own officers and makes its own contracts. Although the Lime Company is the owner of nearly all of its capital stock, that company does not thereby become the owner of the railroad company's road, franchises, or other property. That corporation, whoever may be the owner of its stock, still owns its property. Neither do the stockholders of a corporation control the property of the corporation. Of course, a majority of the stockholders control the election of directors and other officers and agents of the corporation, but the control of the property of the corporation is in the corporation itself and in its officers and agents who are invested with such control by virtue of the by-laws of the company.

The franchises granted to a railroad corporation must be exercised by that corporation and by it alone. There is no identity between the individual or the corporation which owns stock in another corporation and that latter corporation. A corporation is an entity, irrespective of the persons who own all of its stock, and the fact that one person owns all the stock does not make him and the corporation one and the same person. It would seem that the citation of authorities in support of these well established principles would be unnecessary, but we call attention to a few of the many that might be referred to. *Pullman Palace Car Company* v. *Missouri R. R. Co.*, 115 U. S. 587; *McTighe* v. *Macon Construction Company*, 97 Ga. 7, 33 L. R. A. 800; *Button* v. *Hoffman*, 61 Wis. 20, 50 Am. Rep. 131; Morawetz

on Private Corporations, § 227, et seq. We cannot, therefore, see how this allegation can in any way affect the question here involved.

Still another allegation in the complainant's bill is that the Rockland-Rockport Lime Co. in January, 1900, acquired by purchase or otherwise, and is now the owner and in possession and control of all the lime quarries which are now reached by or connected with the railroad, or any of its branches, and that the railroad company has since that time, "refused and neglected to extend or connect its line of tracks with any lime quarry not owned or controlled by said Rockland-Rockport Lime Co."

It is clear, we think, that the first part of this allegation cannot in any way affect the question involved, or the railroad company's right to take the complainants' land for its purposes. If at one time the railroad served a considerable number of independent lime quarries, owned by different owners, and subsequently the ownership of such quarries has been acquired by one person or corporation, the powers, privileges and duties of the railroad company are precisely the same as before, and cannot have been affected by such consolidation of ownership.

As to the second part of the allegation, that the company now refuses to connect with any quarry not owned by the Lime Company, this is a matter which must necessarily depend to a large extent upon the discretion of the management of the railroad company. It cannot be the duty of that company to build a track to connect with any particular quarry simply because such connection may be desired by the owner, independently of the question of the cost of construction and the probable income to be derived therefrom. It is certainly the duty of the management of a railroad company, before entering into new construction, to take into consideration both the probable cost of such construction and the amount of freight for transportation that would thereby be obtained. So long as the directors act in good faith upon any such question, their determination is conclusive and is not subject to review by the court in proceedings of any kind.

If, of course, the railroad company should unreasonably fail to perform the public duty for which it was chartered, and the management should make such discriminations as to clearly show an inten-

tion to exclude from the benefits of the road all persons and corporations, except the Lime Company, its principal stockholder, for the purpose of preventing any competition with the latter company, it might be sufficient to work a forfeiture of the franchises granted to the railroad company. For, as we have seen, the railroad company, irrespective of the fact that substantially all of its capital stock is owned by another corporation organized purely for private purposes and profits, continues to exist as an independent corporation, with public duties to perform, and, because of that fact, invested with valuable franchises. It cannot, therefore, while exercising the franchises and rights with which it has been endowed, because of the public nature of the duties to be performed, conduct the management of its road so as to result in the benefit of one person or corporation, the owner of its stock, and to the exclusion of all others from the benefits which they are entitled to derive therefrom. The public nature of the business of a railroad company depends upon the right of any member of the public to use the road, and to require the company as a common carrier to transport his freight.

But the question whether or not the railroad company has done, or failed to do, anything which should result in a forfeiture of its franchises can only be inquired into in a proceeding appropriate for that purpose, such as an information in the nature of quo warranto, instituted by the proper authorities in behalf of the state. It is not competent in a collateral proceeding, such as this, to show any matter affecting the forfeiture of a charter. Encycl. of Pleading and Practice, Vol. 17, page 409; *Elizabethtown Gas Light Company* v. *Green,* 46 N. J. Eq. 118; *Sewalls Falls Bridge* v. *Fiske,* 23 N. H. 171; *Frost* v. *Frostburg Coal Company,* 24 Howard, 278; *Lee* v. *Drainage Commissioners,* 125 Ill. 47; *Commonwealth* v. *Union Insurance Company,* 5 Mass. 230, 4 Am. Dec. 50; *Attorney General* v. *Adonai Shomo Corporation,* 167 Mass. 424.

We have considered all the reasons set out in the complainants' bill why the relief asked for should be granted. In our opinion it should not be granted for any of these reasons. The bill will therefore be dismissed with costs.

*So ordered.*